IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEWIS HAGGARD, | No. C 06-07658 SI |
| Petitioner, | **ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| BEN CURRY, | |
| Respondent. | |

Petitioner Lewis Haggard, an inmate at the Correctional Training Facility in Soledad, California, filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the Court for consideration of the merits of the habeas petition. For the reasons set forth below, the Court GRANTS the petition.

**BACKGROUND**

In 1979, petitioner was convicted of kidnaping for the purpose of committing robbery and was sentenced to seven years to life in prison. This habeas petition does not challenge petitioner's conviction, but rather the February 4, 2004 decision of the Board of Parole Hearings ("BPH" or "Board") finding petitioner unsuitable for parole. The 2004 hearing was petitioner's thirteenth parole hearing, and was conducted at a time when he was twenty-four years into his sentence.

## I.     Background Facts of the Crime[1]

Petitioner came from an unstable family. Petitioner's mother died when he was six years old. Shortly thereafter, his alcoholic father abandoned him. Petitioner lived with relatives and ran away several times, and eventually dropped out of high school at the age of sixteen. He sometimes abused alcohol and drugs. Around July 1, 1979, when petitioner was twenty years old, he met Joseph Axtell in Salt Lake City, Utah. Petitioner and Axtell hitchhiked together from Utah to California. Axtell eventually thought up a plot to kidnap the manager of a local bank in order to rob the bank, and after several weeks, convinced petitioner to go along with the plan. Petitioner admired and looked up to Axtell, and followed his instructions in carrying out the plan.

On August 5, 1979, Axtell appeared at the South San Francisco home of a bank manager, Mr. Mills. He entered Mills' home, pretending that he was conducting a survey. When Mills said he was not interested and asked Axtell to leave, Axtell produced a sawed-off shotgun and pointed it at Mills' stomach. He had Mills' wife awaken their two teenage daughters, and held all four on the living room sofa at gunpoint. Ten minutes later, petitioner entered the home. Axtell informed Mills that he intended to take him to the bank in order to rob it, and that Mills' family members would be held hostage. Meanwhile, a family friend arrived and was also taken hostage. At some point, Axtell tied up Mills' two daughters in another room, but petitioner later untied the girls and brought them back into the living room, telling Axtell he did not like the way they were tied.

Petitioner guarded Mills' family members and the family friend while Axtell went to the bank with Mills. At the bank, Axtell had Mills summon two other bank employees to help him open the vault. After Mills and the two employees opened the vault, Axtell stuffed $71,000 in a suitcase and returned to Mills' home along with his three hostages. While petitioner stood holding the gun, Axtell bound and gagged all seven hostages – Mills, his wife, their two daughters, the family friend, and the two bank employees. Haggard told the victims that they could call for help after a half hour had elapsed, and he and Axtell fled together in a car. The victims managed to untie themselves within a few

---

[1] Except as otherwise cited, the facts of the crime have been taken from the Probation Officer's Report and Recommendation to the San Mateo County Superior Court on December 17, 1979. Answer, Ex. B.

2

1 minutes and call the police, and Axtell and Haggard were soon arrested. The police recovered the
2 money and retrieved the gun, which was unloaded. They determined that the gun belonged to Axtell.

On October 18, 1979, petitioner and Axtell both entered pleas of *nolo contendere* to the charges of felony kidnaping for the purpose of committing robbery. Petitioner was sentenced to 7 years to life pursuant to California Penal Code § 209, with a minimum eligible parole date of May 19, 1986.

## II.     Previous Criminal History[2]

Petitioner's juvenile record began in 1975 at age 16, and includes runaways, drug possession, destruction of property, telephone harassment, and auto theft. His juvenile record includes no major incidents of violence. As an adult, petitioner had two offenses in the state of Utah, one at the age of 19 (fleeing a peace officer, for which he served thirty days in jail) and the second at the age of twenty (burglary, for which he was sentenced to probation). He was placed in a halfway house, from which he absconded. At the time of his arrest for the kidnaping offense, there was a warrant for his arrest in Utah for unlawful entry and theft. However, Utah dropped its hold after petitioner was arrested in California on the kidnaping charge.

## III.    Prison Disciplinary Record

At the time of the parole hearing at issue in this action, petitioner had spent twenty-four years in prison. He had a total of twelve CDC-115s for "serious" or "administrative" rules violations, ten of which were between 1981 and 1994. None of the write-ups postdating 1994 involved violent behavior. The two CDC-115s postdating 1994 include one violation in 2002 for refusing to work, which was classified as "administrative" rather than "serious," and a violation in 2003 for delaying a peace officer in the performance of his or her duties by failing to respond to a body search as quickly as ordered. Petitioner has also had eight CDC-128As, which are issued by a correctional counselor for more minor rules violations that do not warrant a CDC-115. The majority of these pertain to job performance, with other write-ups for "clothing/bizarre conduct," "misuse of state computer," and possession of

---

[2] Facts of petitioner's previous criminal history and prison record are taken from the October 2003 Life Prisoner Evaluation Report. *See* Answer, Ex. D at 4.

3

contraband.

## IV. Parole Proceedings

### A. Initial parole hearing and eleven subsequent hearings

Axtell was released on parole at the expiration of his seven-year prison term. Answer, Ex. D at 7. At petitioner's initial parole hearing on April 18, 1985, however, the BPH denied petitioner parole based on the circumstances of the commitment offense, petitioner's unstable social history, negative psychological evaluations, and poor institutional adjustment. Petition, Ex. B at 345-47. The BPH recommended that petitioner maintain a discipline-free record, continue to participate in meaningful work assignment, upgrade academically, become involved in a vocation program, and participate in self-help programs. *Id*. at 348. During petitioner's seven subsequent hearings, the Board continued to rely on the same factors to deny parole. The Board made the same recommendations for maintaining a discipline-free record and participating in self-help and therapy programs. *See* Petition at 7-9. Petitioner waived his ninth and tenth parole consideration hearings.

At petitioner's eleventh parole hearing on July 25, 2001, the Board again cited similar reasons for denying parole. The Board also noted petitioner's achievements in completing an electronics course, receiving his GED, being involved in the literacy council, maintaining satisfactory to above average work reports, and remaining discipline-free for seven years. Petition, Ex. B at 281-282. The BPH indicated that if petitioner had been involved in Alcoholics Anonymous and Narcotics Anonymous, the BPH would have been "on the verge" of granting parole. *Id*. at 279.

In denying parole at petitioner's twelfth parole consideration hearing on October 28, 2002, the BPH again relied on petitioner's commitment offense and social history. Answer, Ex. B at 265-66. The BPH also discussed petitioner's disciplinary record in prison, emphasizing his most recent CDC-115 for refusing to work. *Id.* at 266-71. The Board further cited an unfavorable psychological report which indicated that petitioner posed a high risk of violence to society, although it acknowledged a correctional counselor's comment that petitioner "would pose a low degree of threat if released." *Id.* at 267. The Board stated that petitioner "seem[ed] to be programming quite well," advised petitioner to remain discipline-free, and noted that he would be asking for another psychological report to be completed prior

4

to the thirteenth parole hearing. *Id.* at 268-70.

### B.     Thirteenth parole hearing

On February 4, 2004, the BPH held petitioner's thirteenth parole consideration hearing – the hearing giving rise to this habeas petition. At the time of the hearing, petitioner had been working as a porter in Unit A of the prison for eleven months. Petition, Ex. A at 39. Petitioner had received a positive work evaluation stating that he showed genuine concern for the cleanliness of the unit and voluntarily worked additional hours during his days off when asked to do so. *Id*. at 40. The Board noted that petitioner had much to be commended for, including participating in Narcotics Anonymous and other prison programs:

> The fact that he has – he did acquire a GED in 1990, has maintained a high TABE [Test of Adult Basic Education] score. That he completed the basic electronics course. He has experience in auto mechanics. That he spent a number of years in laundry as a mechanic. Has laudatory chronos for his work as a porter, and received excellent work reports in a variety of positions; culinary and PIA jacket factory, mattress factory, shoe factory, and serving as a clerk. He's to be commended for his participation in NA. Many years, in the CAT T Program; his ongoing participation in Chapel, which we consider to be self-help. The fact that he completed a variety of self-help programs in the past; Managing Mental Illness, Self-Esteem Assertiveness Training, Relaxation, Stress Management, Square Once, that has ongoing participation in the Buddhist meditation. Has worked as a tutor and a volunteer recreation aide. He's to be commended for all of these things.

*Id.* at 95-96. The Board also heard evidence of petitioner's plans upon his release, which included living with his wife, whom he married soon after his incarceration and with whom he had maintained a relationship; working as a mechanic; and seeking continued NA support in the community. *Id.* at 60-62.

The Board also had before it evidence that petitioner's bid for parole was supported by Dr. Macomber, a prison psychologist and correctional counselor who had most recently examined petitioner, and by Judge Ragan, the judge who had presided over petitioner's 1979 criminal trial. Dr. Macomber stated that petitioner "d[id] not pose a risk for re-offense or for future violence." Petition, Ex. A at 93. Dr. Macomber claimed that Dr. Livingston, who had performed the previous evaluation of petitioner, was in violation of ethical standards in using certain tests to evaluate petitioner and to conclude that he did pose a risk of violence, as the tests were not meant to be used on long-term inmates or inmates over the age of forty. *Id*. at 93-94. Judge Ragan's letter, which dated back to 1989, stated that "since the co-

5

defendant has been released, it would only be fair to release Mr. Haggard." *Id.* at 10.

In spite of this positive evidence, the Board again denied parole, finding that petitioner's positive traits did not outweigh the factors of unsuitability. *Id.* at 96. The Board cited the commitment offense as "a primary reason for the denial." *Id.* at 90. The Board also cited petitioner's most recent disciplinary action, a CDC-115 issued in January 2003 for delaying a peace officer, finding that petitioner needed additional therapy "in order to develop the skills that will allow him to deal with stress in a non-destructive manner." *Id.* at 94. The BPH declined to discount Dr. Livingston's negative psychological evaluation, stating that Dr. Macomber was "entitled to his opinion" but that the BPH would not "determine whether Dr. Livingston or Dr. Macomber [was] more qualified." *Id.* at 93-94. The Board stated that it would request another psychological evaluation prior to the next parole hearing.

## V.  State and Federal Habeas Proceedings

Petitioner filed a petition for writ of habeas corpus in state court on May 30, 2005, arguing, among other things, that the February 4, 2004 parole denial was based on insufficient evidence of dangerousness. The state court denied the petition, finding that "the Board relied on more than just the commitment offense in making its decision to deny a parole release date." Petition, Ex. M at 448. The court pointed to the BPH's findings regarding petitioner's prison disciplinary record and his psychological evaluations. *Id.* at 449. Petitioner appealed the denial of his state habeas petition. The California Court of Appeal issued a summary affirmance in February 2006 and the California Supreme Court denied review in April 2006. Petition, Ex. O-P.

Petitioner filed the present federal petition for writ of habeas corpus on December 14, 2006. After briefing was complete, the Court stayed consideration of the petition in view of the Ninth Circuit's pending en banc reconsideration of *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008), a case addressing the standards to be applied in ruling on California prisoners' collateral challenges to parole denials. The Court lifted its stay on March 10, 2010, before an en banc decision had been issued in *Hayward*, stating that the Court did not wish to delay consideration of petitioner's claims any longer. The Ninth Circuit then issued the *Hayward* decision on April 22, 2010.

6

**JURISDICTION AND VENUE**

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. This action is properly filed in this venue because the conviction occurred in the county of San Mateo, California, which is located within this judicial district. *Id.* § 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). Respondent agrees that state court remedies were exhausted for the claims in the present petition.

**STANDARD OF REVIEW**

The Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362 (2000). A state court decision is "contrary to" Supreme Court authority if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The state court's application of federal law must be "objectively unreasonable" to support granting habeas relief. *Id.* at

1   409; *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

2   A federal court considering a petition brought under Section 2254(d) must review the "last
3   reasoned decision" of the state courts denying relief to the petitioner. *Ylst v. Nunnemaker*, 501 U.S. 797,
4   803-04 (1991). In this case, the last reasoned decision is the San Mateo County Superior Court's August
5   11, 2005 denial of petitioner's state habeas petition.

## DISCUSSION

### I.   The "Some Evidence" Standard

Petitioner challenges the San Mateo County Superior Court's 2005 determination that the BPH's 2004 parole denial was supported by "some evidence." A habeas petition under Section 2254(d) is available to a California prisoner who seeks to challenge the denial of parole. *Hayward v. Marshall*, 603 F.3d 546, 552, 562 (9th Cir. 2010) (en banc). The United States Constitution does not, by itself, provide state prisoners with a federal right to release on parole in the absence of some evidence of current dangerousness. *Id.* at 561. As a matter of California law, however, "some evidence" of dangerousness is required in order to deny parole. *In re Lawrence*, 190 P.3d 535, 549 (Cal. 2008); *In re Shaputis*, 190 P.3d 573, 582 (Cal. 2008). This state law requirement vests California prisoners with a federal liberty interest in release on parole in the absence of some evidence of their dangerousness. *Id.* at 562; *see also Pearson v. Muntz*, 606 F.3d 606, 608-09 (9th Cir. 2010) (holding that "state-created rights may give rise to liberty interests that may be enforced as a matter of federal law," and therefore, pursuant to *Hayward*, "courts must apply the California 'some evidence' test on federal habeas review under AEDPA"). In reviewing petitioner's challenge to the February 2004 parole denial, the Court must therefore "decide whether the California judicial decision approving the [BPH]'s decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(1)-(2).

California courts make use of state parole regulations in determining which inmates may pose an unreasonable risk of danger to public safety. Factors tending to show unsuitability for parole include the nature of the commitment offense, a previous record of violence, an unstable social history,

commission of sadistic sex offenses, a history of severe mental problems related to the offense, and serious misconduct while in prison. Cal. Code Regs., tit. 15, § 2281(c). Relevant factors tending to show suitability for parole include the lack of a juvenile record, a stable social history, signs of remorse, significant stress as the motivation for the crime, lack of a history of violent crime, the prisoner's age, the presence of realistic plans for the future, and good behavior while in prison. *Id.* § 2281(d). "While the regulatory factors are designed to guide the Board's decision, the ultimate question of parole suitability remains whether the inmate poses a threat to public safety. There must be some evidence of such a threat, and not merely evidence that supports one or more of the Board's subsidiary findings." *Pirtle v. Morgan*, --- F.3d ----, 2008 WL 2732888, at *5 (9th Cir. July 12, 2010) (quotation marks omitted) (citing *Hayward*, 603 F.3d at 562).

## II. Application

After careful review of the record in this case, the Court finds that the state court unreasonably applied the "some evidence" standard when it concluded that the BPH's denial of parole was supported by the facts in the record. Contrary to the state court's determination, the circumstances of the commitment offense, petitioner's prison disciplinary history, and petitioner's psychological evaluations did not provide some evidence supporting the conclusion that his release would unreasonably endanger public safety. Each category is discussed in turn below.

### A. Commitment offense

The BPH cited the circumstances of the commitment offense as a "primary reason" for denying parole, finding that "[t]he manner in which it was carried out . . . show[ed] a lack of regard for the suffering of others" and that "the event was calculated and carried out in a cruel fashion." Petition, Ex. A at 90-91. The state court held that the BPH's denial of parole was proper, finding that the "gravity of the offense," when taken in combination with the other factors to be discussed below, constituted some evidence in support of the denial.

The state court's determination constituted an unreasonable application of the "some evidence" standard, as the aggravated nature of petitioner's offense can no longer provide support for a finding that

9

petitioner poses a danger to public safety. The California Supreme Court has held that "although the Board . . . may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports a continued finding of current dangerousness. *Lawrence*, 190 P.3d at 555; *see also Hayward*, 603 F.3d at 562. Where there is strong evidence of rehabilitation and other factors indicating suitability for parole, and the commitment offense is "temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur," the commitment offense "does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." *Lawrence*, 190 P.3d at 539 (emphasis omitted). In other words, while the BPH may look to the nature of the commitment offense to determine that a prisoner is not currently suitable for parole, the weight to be attributed to the nature of the offense as a predictor of dangerousness should decrease as the years pass and the prisoner demonstrates favorable behavior.

Petitioner's commitment offense occurred twenty-five years prior to the 2004 parole hearing, when he was only twenty years old, was using drugs, and was strongly influenced by Axtell, whom he looked up to and admired. Although petitioner admitted that he voluntarily took part in the crime, the evidence was essentially undisputed that Axtell planned and directed its execution. These circumstances indicate that the offense conduct was unlikely to recur as of 2004. Petitioner emphasized at the parole consideration hearing that he had matured significantly since the time he committed the crime, stating, "I'm not the same 20-year-old person I was back then as I am now. I'm older and wiser. I'm a lot older. A lot more intelligent than I was back then obviously. But I'm just not the same man I was back then. I was basically a kid. . . . I feel I've matured a lot over the years." Petition, Ex. A at 54. Additionally, the Board had before it evidence that petitioner was attending NA, had gotten an education, had completed a number of other self-help programs in prison, and had taken steps to find an NA sponsor outside prison to ensure that he would remain clean once released. *Id.* at 48-49, 60. Petitioner's age and maturity at the time of the parole hearing and his formulation of realistic plans for the future qualify as circumstances tending to show suitability for parole. *See* Cal. Code Regs., tit. 15, § 2281(d). Under

these circumstances, the commitment offense did not continue to provide evidence that petitioner was a threat to public safety at the thirteenth parole hearing so many years later.

In addition, at the time of the parole decision, petitioner had served more than twenty-four years in state prison, seventeen more years than his base term of seven years. Once "prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." *Lawrence*, 190 P.3d at 553. The BPH itself acknowledged the substantial evidence of petitioner's rehabilitation in prison, including his completion of a high school education and various vocational courses, his stable work history, his participation in NA and other self-help programs, his religious activities, his volunteer work as a tutor and a recreation aid, and his plans to live with his wife and maintain steady employment upon his release from prison. Given this strong evidence of rehabilitation and the absence of other indications of dangerousness, as discussed in the following sections, the state court acted unreasonably in finding that petitioner's commitment offense continued to provide some evidence supporting the 2004 parole denial.

### B.   Prison Disciplinary Record

The BPH also relied on petitioner's prison disciplinary record in denying parole, focusing primarily on the CDC-115 issued to petitioner in January 2003 for delaying a peace officer. This infraction resulted from petitioner having shouted at a correctional officer who had ordered him to submit to a body search. In questioning petitioner about the violation, the Board referred to petitioner's "history of having a temper" and his efforts to control his temper, and asked him why he had allowed himself to act out. Petition, Ex. A at 50. Petitioner explained that he had just completed an 18-hour shift and was in a deep sleep when the officer startled him and woke him up in order to perform the search. He stated that in shouting out in frustration, he "made a mistake," and explained that "[t]he lesson learned is that I have to even be mindful of my surroundings, even when – no matter how tired or how asleep I am." *Id*. at 51. He also stated that at the time of the incident, he was in the process of transitioning off of psychotropic medication. *Id.* at 55, 73-74.

In finding that this incident supported a finding of future dangerousness, the Board explained,

11

"Granted, there was no violence. But it just leads the Panel to believe that you can't be – At this point, that you're not able to deal with stressors that come your way without getting into trouble, without breaking the rules." *Id.* at 95. In affirming the BPH's parole denial, the state court simply referred in passing to petitioner's "negative . . . . institutional behavior," without explaining why it believed that petitioner's disciplinary record weighed in favor of the denial. Petition, Ex. M at 448-49.

The state court's determination that petitioner's prison disciplinary record provided some evidence in support of the parole denial constituted an unreasonable application of the "some evidence" standard. Neither the Board nor the state court provided any link between petitioner's behavior during the 2003 incident and a finding of current dangerousness. To the contrary, the BPH had before it a specific finding by psychologist Dr. Macomber that the incident did not involve "violence or aggression," Petition, Ex. B at 197, and the Board apparently agreed with that finding. Additionally, the Board heard evidence that the incident occurred during a time when petitioner was phasing out his use of psychotropic medications, but did not give any consideration to this unique circumstance or its effect on the likelihood that the misconduct would recur. Finally, although the Board chastised petitioner for failing to control his temper, it failed to explain how petitioner's act of raising his voice indicated that he posed a danger to public safety.

As of the 2004 parole hearing, petitioner had not been disciplined for engaging in violent behavior for ten years. Particularly when considered in light of his stable record, the 2003 incident did not provide evidence that he posed a continuing threat to public safety, and the state court's contrary determination was objectively unreasonable.

**C.    Psychological Evaluations**

Finally, the state court held that petitioner's psychological evaluations provided some evidence in support of the BPH's denial of the parole. During the 2004 parole hearing, the BPH first cited a June 2002 evaluation conducted by Dr. Livingston, which found that petitioner posed a moderate to high risk of violence based on the results of three psychological tests:

[T]he probability of the risk for future violence by this inmate is determined from three

12

> instruments specifically developed and validated for this purpose. The three instruments are the Psychopathy Checklist (PCL-R), the History Clinical Risk-20 (HCR-20) and the Violence Risk Appraisal Guide (VRAG). From each of these instruments, a rating of low, moderate or high is obtained and will be cited in this report.
>
> The PCL-R is an instrument developed and validated to assess for psychopathy in male forensic populations. . . . Mr. Haggard's score on the PCL-R was indicative of psychopathy at the moderate level. The results of the PCL-R may be further divided into two subfactors one reflecting a selfish and remorseless attitude towards others while factor 2 contains items describing a chronically unstable and antisocial lifestyle. Mr. Haggard scored at the moderate level on both of these factors.
>
> The HCR-20 is a checklist of risk factors for violent behavior. It includes variables which capture relevant past, present and future considerations. Overall, Mr. Haggard's score on the HCR-20 indicated a high risk for violence.
>
> The VRAG is a brief actuarial instrument providing probability scores of re-offending in the next 7-10 years. Mr. Haggard's score placed him as a high risk for violence within the next ten years.

Petition, Ex. B. at 201.

Second, the Board reviewed an evaluation conducted in July 2003 by Dr. Macomber, which concluded that petitioner's "risk level, in comparison to the average citizen in the community is below average." *Id.* at 197. Dr. Macomber noted that petitioner "has experienced deep, profound, and serious changes over the years" as a result of his increasing age and maturity, commitment to his wife, efforts to prevent substance abuse, and adoption of the Christian religion. *Id.* at 196-97. Dr. Macomber stated, "There are no psychological factors in this case that would interfere with his being granted a parole date. . . . At this point inmate Haggard is very pro-social. Prognosis for successful parole adjustment is excellent. This man does not need to participate in any further psychotherapy or further psychological evaluations." *Id.* at 197-98.

In his 2003 report, Dr. Macomber responded specifically to the contrary conclusions reached by Dr. Livingston after his evaluation the preceding year. Dr. Macomber took issue with Dr. Livingston's use of the PCL-R, HCR-20, and VRAG tests. First, with respect to the HCR-20 and VRAG tests, Dr. Macomber wrote that "these measures are totally inappropriate to be used with life-term inmates" because the measures "are based upon historical factors that do not change with age . . . . [and] have no way of accounting for the changes that occur to inmates who have spent many years in prison." *Id.* at 195-96. He stated that the "life-changing experiences [that occur in prison] are very important and must be considered in a psychological evaluation that is to address current dangerousness or potential for

13

violence." *Id.* at 196. Second, Dr. Macomber wrote that the creator of the PCL-R test "specifically notes that his tests should never be used on inmates over the age of 40, as his test is attempting to assess psychopathy which is a characteristic that decreases with age." *Id.*

After reviewing the results of each evaluation at the 2004 hearing, the Board stated, "There is a problem with the psychological evaluations; the last two. And that problem in the Panel's view is that they are so completely different." Petition, Ex. A at 93. The Board acknowledged Dr. Macomber's criticisms of Dr. Livingston's methods, but stated that it would not "determine whether Doctor Livingston or Doctor Macomber is more qualified." *Id.* at 93-94. The Board then stated that it would request another psychological evaluation prior to the next parole hearing. The state court affirmed the BPH's conclusion that petitioner was not entitled to parole as a result of the inconsistency between the two most recent evaluations. Petition, Ex. M at 449.

The BPH's and the state court's reliance on the inconsistency in the two evaluations as a reason for denying parole was objectively unreasonable. As an initial matter, even if the 2002 and 2003 evaluations constituted the only psychological information available to the Board, the mere fact of an inconsistency would not have provided some evidence of petitioner's dangerousness. Additionally, the Board had at its disposal a wealth of evaluations by both psychologists and correctional counselors indicating that petitioner posed a low risk of violence, or, at the very most, an average risk. For example, psychological evaluations conducted in 1998 and 2000 indicated that petitioner's potential for violence outside of prison was "below that of the average inmate" and "in the average range," respectively. Petition, Ex. B at 204, 206. Evaluations by correctional counselors dating between 1995 to 2003 all found consistently that petitioner would pose a low degree of threat to the public safety if released from prison, given his efforts at rehabilitation and his increased age and maturity. *Id.* at 119, 125, 135, 142, 149, 155. In light of this substantial positive evidence, the Board and the state court acted in an objectively unreasonable manner by simply refusing to consider or credit Dr. Macomber's methodological challenges to Dr. Livingston's negative report – the sole outlier among a number of positive evaluations – in reaching their decisions. The denial of parole on the basis of the inconsistent psychological evaluations constituted an objectively unreasonable application of the "some evidence" standard.

14

## CONCLUSION

For the reasons stated above, the Court finds that no evidence in the record before the Board of Parole Hearings at the February 2004 parole consideration hearing supported the determination that petitioner posed a danger to society if released. The Board's and the state court's contrary conclusion was an unreasonable application of California's "some evidence" standard. Accordingly, the Court hereby GRANTS the petition for writ of habeas corpus.

The most minimal remedy available to the Court is to remand the case to the Board with instructions to hold another parole hearing. However, in view of the extraordinary length of time for which petitioner has been confined beyond his minimum eligible parole date, and the fact that his co-defendant was released on parole twenty-four years ago, the Court instead orders petitioner's release. *See Pirtle*, 2010 WL 2732888, at *8 ("Upon granting the writ, the district court ordered the Board to set a parole date for Pirtle within thirty days. The State argues that the district court's remedy was improper, and that the appropriate remedy would be to remand the case to the Board with instructions to hold another hearing. There is no merit to this argument. . . . Ordering the release of a prisoner is well within the range of remedies available to federal habeas courts.").

The Board of Parole Hearings is hereby ordered, within thirty days of this order, to set a date for petitioner's release. Within ten days of petitioner's release, respondent shall file a notice with the Court confirming the release date.

**IT IS SO ORDERED.**

Dated: August 11, 2010

SUSAN ILLSTON
United States District Judge